1  Joshua H. Watson, SBN 238058
   **CLAYEO C. ARNOLD**
2  **A PROFESSIONAL LAW CORPORATION**
   865 Howe Avenue
3  Sacramento, CA 95825
   Telephone: (916) 924-3100
4  Facsimile: (916) 924-1829
   Email: jwatson@justice4you.com
5
6  *Attorney for Plaintiffs and the Class*
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  AKI BERRY, CHERYL HAYTON, TIFFANY SCHEFFER, | Case No.: |
| 12 | |
| 13       Plaintiffs, | CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |
| 14  vs. | |
| 15  LULAROE, LLC d/b/a LuLaRoe, a California Limited Liability Company, LLR, Inc., a Wyoming Corporation, and DOES 1 through 100, inclusive, | **1. Endless Chain Scheme; California Penal Code §327and California Civil Code § 1689.2** |
| 16 | |
| 17       Defendants. | **2. RICO 18 U.S.C. § 1962(a)** |
| 18 | 3. **RICO 18 U.S.C. § 1962(c)** |
| 19 | 4. **RICO 18 U.S.C. § 1962(d)** |
| 20 | 5. **Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200, et seq.** |
| 21 | |
| 22 | **6. False Advertising California Business and Professions Code § 17500, et seq.** |

23          1.    Plaintiffs Aki Berry, Tiffany Scheffer, and Cheryl Hayton bring this class action

24  lawsuit on behalf of themselves and on behalf of all persons who were LuLaRoe consultants

25  from 2013 until present under California's Endless Chain Scheme Law (California's Penal Code

26  § 327 and California Civil Code § 1689.2), the Racketeer Influenced and Corrupt Organizations

27  Act, 18 U.S.C. § 1961 et seq.; California's Unfair Competition Law (Business and Professions

28  Code Section 17200 et seq.), False Advertising (Business and Professions Code § 17500) against

1 Defendant Lularoe, LLC d/b/a LuLaRoe, a California Limited Liability Company, Defendant

2 LLR, Inc., a Wyoming Corporation, and DOES 1-100 (collectively "Defendants") for the

3 operation and promotion of an inherently fraudulent pyramid scheme and/or endless chain

4 scheme.

5        2.    Plaintiffs were unknowingly recruited into Defendants' pyramid scheme through

6 manipulation and misinformation.  Recruits were told that the opportunity entailed "part-time

7 work for full time pay."  This was not the case.  Once consultants signed up, they were pressured

8 to invest and reinvest by purchasing Defendants' clothing products – regardless of whether they

9 were able to sell their inventory.  Plaintiffs were inundated with the slogan "buy more sell more"

10 and were told they would recoup their investments through retail sales and recruitment.

11 Plaintiffs and tens of thousands of other consultants never even made a profit – they were duped

12 by Defendants' endless chain scheme that only profited a few and only made payments to

13 consultants based on how much product those consultants and their recruits purchased on a

14 regular basis.

15        3.    Defendants allowed their scheme to grow at an exponential rate such that it

16 peaked and began to implode within a few short years.   Defendants achieved such rapid growth

17 by enticing consultants with social media posts boasting large bonus checks and other lavish

18 material possessions, which were "because of LLR."  Consultants were told they could "attain

19 financial freedom" by recruiting others to become retail consultants for Defendants' "business"

20 and by having those consultants purchase (and continue to purchase) inventory from Defendants.

21 Plaintiffs and tens of thousands of other consultants were told they could attain such financial

22 freedom as long as they (and the recruited consultants beneath them) continued to buy inventory

23 from Defendants.  None of Defendants' bonus payments to their consultants depended upon an

24 actual sale to a consumer - the checks were solely based on inventory purchased by consultants.

25        4.    Believing Defendants' representations, and not realizing they were being pulled

26 into an endless chain scheme, Plaintiffs and a vast multitude of other consultants signed

27 agreements with Defendants to become LuLaRoe consultants.  Each sent in many thousands of

28 dollars to purchase Defendants products and were pressured to ask others to do the same.

5. Plaintiffs and the other consultants – who did not sit at the top of Defendants' pyramid – worked very hard attempting to earn money selling Defendants' products and, specifically in recruiting other consultants. However, Defendants' endless chain scheme spread like wildfire and quickly created an over saturated market. Plaintiffs and countless other consultants were told they weren't able to sell the product, because they needed to acquire more inventory.

6. Plaintiffs and so many other consultants were never able to realize any actual profit and, as a result, they failed. They failed even though they were committed and put in the time and effort. They failed because they were doomed from the start.

7. Plaintiffs and the droves of other consultants were doomed by a LuLaRoe scheme that paid no mind to retail sales. Defendants were primarily focused on paying consultants for recruiting and making a profit solely based on the chain of consultant purchases. Moreover, LuLaRoe paid consultants based on their recruits' inventory purchases – regardless of whether those recruits actually had any retail sales. Moreover, the consultants *could not even qualify for such payments unless they continued to purchase inventory.* Paying millions to those few at the top of the company at the expense of the many at the bottom through a "pyramid scheme" or "endless chain" is illegal. Accordingly, Plaintiffs, on behalf of themselves, on behalf of all others similarly situated, and on behalf of the general public set forth the allegations herein on information and belief as follows:

**PARTIES**

8. Plaintiff Aki Berry is and at all relevant times was an individual who resides in Sacramento County, California. Plaintiff Aki Berry entered into a LLR, Inc. Independent Consultant Program Application and Agreement with Defendants and became a LuLaRoe consultant in or about October 2015.

9. Plaintiff Tiffany Scheffer is and at all relevant times was an individual who resides in Sacramento County, California. Plaintiff Tiffany Scheffer entered into a LLR, Inc. Independent Consultant Program Application and Agreement with Defendants and became a LuLaRoe consultant in or about April 2016.

10.     Plaintiff Cheryl Hayton is and at all relevant times was an individual who resides in Sacramento County, California.  Plaintiff Cheryl Hayton entered into a LLR, Inc. Independent Consultant Program Application and Agreement with Defendants and became a LuLaRoe consultant in or about April 2016.

11.     Defendant Lularoe, LLC d/b/a LuLaRoe is and at all material times was a California Limited Liability Company located at 1375 Sampson Avenue in Corona, California.

12.     Defendant LLR, Inc. is and at all material times was a Wyoming Corporation with its principal place of business located at 416 Double Eagle Ranch Road, Thayne, Wyoming 83127.

13.     The true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become known.

14.     DOES 1-50 were at all relevant times, primary beneficiaries and promoters of the LuLaRoe pyramid and/or endless chain scheme.

15.     Based upon information and belief, it is alleged that at all times mentioned herein, each and every Defendant and DOE was acting as an agent and/or employee and/or joint venture and/or co-conspirator of each of the other Defendants and DOES, and at all times mentioned was acting within the course and scope of said agency and/or employment and/or joint venture and/or conspiracy with the full knowledge, permission, consent and ratification of each of the other Defendants and DOES.  In of addition, each of the acts and/or omissions of each Defendant and DOE alleged herein were made known to, and ratified by, each of the other Defendants and DOES.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because the suit is a class action, the parties are minimally diverse, and the amount

1  in controversy exceeds $5,000,000, excluding interest and costs. The Court has supplemental

2  jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

3        17.    This Court has personal jurisdiction over Defendants, because Defendant Lularoe,

4  LLC d/b/a LuLaRoe is headquartered in this District; Defendants do a substantial amount of

5  business in California, including in this District; are authorized to conduct business in California,

6  including in this District; and have intentionally availed themselves of the laws and markets of

7  this District through the promotion, sale, marketing, and/or distribution of their products and

8  services.

9        18.    Venue is proper in this district under 28 U.S.C. §1391(a)(1) and (a)(2) because a

10  substantial part of the events or omissions giving rise to this claim occurred in this district.

11  Venue is also proper under 18 U.S.C. §1965(a), because Defendants transact a substantial

12  amount of its business in this District and have a law and forum selection clause in certain of its

13  "LuLaRoe Independent Consultant Program Application and Agreement[s]" which selects the

14  Central District of California as the venue.

## THE LAW AGAINST PYRAMID SCHEMES

16        19.    In *Webster v. Omnitrition Int'l, Inc.*, the Ninth Circuit adopted the "Koscot test"

17  for determining what constitutes a pyramid scheme:

18            Pyramid schemes are "[s]uch contrivances. . . characterized by the
             payment by participants of money to the company in return for
19            which they receive (1) the right to sell a product and (2) the right
             to receive in return for recruiting other participants into the
20            program rewards which are unrelated to sale of the product to
             ultimate users."
21

22  *Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) ("*Omnitrition*") quoting *In re*

23  *Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom. ("*Koscot*").

24        20.    The second element of the *Koscot* test is the determining element for a pyramid

    scheme:
25

26            The satisfaction of the second element of the *Koscot* test is the *sine
             qua non* of a pyramid scheme: "As is apparent, the presence of this
27            second element, recruitment with rewards unrelated to product
             sales, is nothing more than an elaborate chain letter device in
             which individuals who pay a valuable consideration with the
28

> expectation of recouping it to some degree via recruitment are bound to be disappointed."

*Omnitrition*, 79 F.3d at 782.  The Ninth Circuit held that "the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes."  *Id.*

21.    A multi-level sales organization where members obtain monetary benefits primarily from the recruitment of new members rather than from selling goods to bona fide consumers is an endless chain scheme.  Endless chain schemes are inherently deceptive because most participants are doomed to failure, even if some retail sales occur:

> "The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur."  Thus, the fact that some retail sales occur does not mitigate the unlawful nature of the overall arrangement.

*Omnitrition*, 79 F.3d at 782, citing *In re Ger-Ro-Mar Inc.*, 84 F.T.C. 95, 148-49 (1974), rev'd on other grounds, 518 F.2d 33 (2d Cir. 1975).

22.    "Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'"  *Omnitrition*, 79 F.3d at 781 (quoting *Koscot*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978)).

23.    Endless chain schemes are inherently fraudulent by nature because the futility of the plan is not apparent to the participant:

> Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramia scheme as a matter of law. As to justifiable reliance, the very reasons for the per se illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the "futility" of the plan is not "apparent to the consumer participant."

*Omnitrition*, 79 .3d at 788 (citations omitted).

24.    Section 327 of the California Penal Code prohibits endless chains:

> Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a public offense, and is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, two, or three years.

As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

Compensation as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

25.    Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

**FACTUAL ALLEGATIONS DEMONSTRATING  LULAROE'S SCHEME**

26.    The LuLaRoe brand was created in 2012 by Deanne Brady and her husband Mark Stidham, and is currently based in Corona, California.  In 2013 the company grew to 10 employees, 145 distributors, and $3 million in sales.

27.    Defendants, among other things, advertise, market, manufacture, distribute, and sell LuLaRoe brand clothing which includes shirts, dresses, skirts, leggings and other clothing products through a chain of independent distributors (referred to as "consultants") who are expected to continuously purchase the clothing. Defendants provide compensation to consultants through bonuses payments that are based on that consultant's recruitment of additional consultants who are also expected to make continuous purchases and so on and so on.

28.    After commencing the scheme in 2013, LuLaRoe continued to grow exponentially by aggressively recruiting consultants to sell products directly, often through social media.  LuLaRoe reported sales of approximately $1 billion in 2016.  By 2017, there were approximately 80,000 LuLaRoe consultants.

29.    LuLaRoe sets forth the following message at its website "www.lularoe.com" in the section entitled "Join the Movement":

Becoming a LuLaRoe Fashion Retailer can provide you opportunity to have the means, the time, and the flexibility to

pursue your passions and to more fully enjoy the company of those you love.  It can be the way by which you overcome a set back or finally get beyond "just making ends meet." It can restore or improve confidence in both your appearance and your abilities and it will provide immense satisfaction as you help others to find such confidence in themselves. As a LuLaRoe Retailer you will become part of a team of driven individuals who are writing their own stories. They are enjoying their work. They are building new relationships with positive and successful people. They are becoming more confident, empowered individuals. They are making significant income all by scheduling and co-hosting LuLaRoe Pop-Up Boutiques.  And you can, too.

There is also a link on the page which purports to reveal a "retailer map;" however, as of October 2017, the link suspiciously produced the following message:

We couldn't find the page you were looking for. This is either because:

•There is an error in the URL entered into your web browser. Please check the URL and try again.

•The page you are looking for has been moved or deleted.

You can return to our homepage by clicking here, or you can try searching for the content you are seeking by clicking here.

Thus, the number of consultants is concealed.

30.     LuLaRoe clothing can only be purchased through consultants.  The consultants are required to purchase an initial inventory (as well as required to consistently replenish inventory) directly from LuLaRoe.  Consultants are required to resell the items for approximately a 40% markup and are generally forbidden to advertise lower prices.  LuLaRoe consultants are required to purchase an initial inventory of clothing and marketing materials which cost between $4,925 and $9,000.  Consultants are also encouraged to buy business cards, advertising materials, hangers, storage, website programs, etc. to support their "business."

31.     LuLaRoe consultants have zero control or choice regarding what patterns are on the fabric of products shipped to them from Defendants when ordering their inventories.  They receive whatever patterns Defendants decide to send them.  Presumably, this is because the end goal for Defendants was never primarily about sales to consumers.  In fact, as the number of

1  consultants purchasing inventory continued to grow exponentially, the quality of the LuLaRoe
2  products and patterns deteriorated significantly.

3       32.    When consultants would receive obvious pattern defects (mismatched seams,
4  upside down patterns, mismatch leg lengths, etc.), the consultants would not be permitted to
5  return those items as "defects."  Instead, the consultants were told things like "it's part of the
6  charm" and "everything sells."  Such products would simply pile up in the consultants inventory.

7       33.    Consultants are told they can make money in two ways: 1.  by recouping from
8  consumers the money they spent ordering the LuLaRoe clothing from Defendants via sales
9  ("also known as pop up parties"), and 2.  by way of bonuses (commission) based on the
10 inventory purchased from LuLaRoe by the consultants "down line."  A consultant's "down line"
11 is comprised of the individuals the consultant recruits (as consultant) to purchase inventory.

12      34.    The LuLaRoe bonuses (the commission payments) and purchasing large
13 quantities of inventory are the primary way consultants are told they can make money.  The
14 Leadership Bonus Plan includes that "Retention [of consultants] will be driven by creating an
15 emotional, as well as financial, tie to LuLaRoe."  To strengthen such ties, Defendants exerted
16 control over the consultants by disallowing criticisms and/or public speech about any negative
17 experiences through non-disparagement and indemnification clauses.  Specifically, the non-
18 disparagement clause stated that "negative comments. . .serve no purpose other than to sour the
19 enthusiasm of other LLR Independent Fashion Consultants."  Moreover, consultants were
20 contractually forbidden - via a three-year, nationwide non-competition clause - from recruiting
21 any LuLaRoe consultants to "for another direct selling, MLM, or network marketing business."

22      35.    In other words, Defendants make profits *not* from their consultants sales to
23 consumers, but solely from the purchase of inventory by consultants.  Consultants are pressured
24 to recruit and create a "downline."  Those consultants with a "down line" are paid bonuses  not
25 by the actual number of LuLaRoe items sold, if any, by their "down line" consultants, but by
26 their *inventory purchases* from LuLaRoe.

27      36.    There are different levels of bonus payments depending on how many new
28 consultants are recruited into a consultant's downline.  Those levels include Sponsor, Trainer,

Class Action Complaint                          9

Coach, and Mentor.  At each level, the amount of inventory that a consultant is responsible for ensuring is purchased from LulaRoe (by her down line) increases and the pressure to do whatever it takes to make the inventory purchase goals intensifies.

37.    This is because consultants with a downline can only receive bonus payments if everyone in their downline continues to repeatedly buy inventory from LulaRoe.  Actual sales of the product to consumers is not a factor.  For example, LulaRoe's Leadership Bonus plan from 2014 states:

> Any Fashion Consultant may sponsor other people into the business, however, in order to receive a bonus on the Personal Volume of those you sponsored you must order and pay for 175 pieces in the calendar month for which the bonus is calculated.
>
> ***
>
> A Trainer must qualify with 250 pieces (100 of which must be generated by their personal orders), at least three Personally Sponsored Fashion Consultants, with a total of ten Fashion Consultants in their team and 1,750 Total Group pieces ordered and paid for.  As a Trainer you may earn qualification points by helping your Personally Sponsored Fashion Consultants order and pay for 175 pieces for the month.  For each Personally Sponsored Fashion Consultant who orders and pays for 175 pieces, the Trainer's personal qualification requirement will be reduced by 50 pieces.  For example, a Trainer who has three Personally Sponsored Fashion Consultants who order and pay for 175 items each, will earn 150 pieces towards their total and must then order and pay for at least 100 personal pieces to qualify for the Trainer Bonus.  Your own pieces do not count towards the Group Piece total.  The trainer's personal qualification requirement will be reduced by 50 pieces.

38.    In order to drive money up the pyramid, the consultants are intensely pressured by their up line to buy more inventory with any money they recoup from their initial investment for at least their first year of selling LuLaRoe products.  In fact, consultants are instructed to keep around $20,000 worth of inventory on hand, and are inundated with the phrase "buy more, sell more."  These incentives mean new consultants (at the bottom of the pyramid and in over saturated markets) are aggressively pressured to continue purchasing wholesale inventory even when the inventory they have is not selling, is unlikely to sell, or is piling up in their garage.

Class Action Complaint                               10

39.     When consultants could not afford to purchase inventory, Defendants and their representatives encouraged them to borrow money, get loans, take out credit cards, and some were even asked to sell their breast milk to attain funds to purchase inventory.

40.     Defendants created incentives and challenges to the consultants to recruit and to purchase more and more inventory.  Defendants would entice consultants by awarding prizes (for example, pre-paid cruises and designer purses) to consultants who purchased the most inventory – *regardless* of their actual sales to consumers.

41.     One incentive offered by Defendants was for a cruise that took place in February 2015.  To qualify for the cruise the consultants were told:

>  Remember you ONLY have to order 400 pieces a month for four consecutive months to qualify!!

> ***

> As a Leader and Fashion Consultant in the business, please do all you can to uplift and support your group to get on the cruise.

42.     Consultants were further mislead, as Defendants and its representatives directed certain consultants to post images of themselves on social media flaunting new designer purses, cars, homes, and other purported evidence of their success withe the hashtag "#becauseofLLR." Those individuals posted pictures of large bonus checks.  (i.e. $30,000, $100,000 etc.)  Such postings were blatantly geared toward recruitment and not actual sales of the product.

43.     While retail sales did occur, Defendant's illegal business model was not dependent on any actual sales.  Defendants' predominant and aggressive focus of attaining its revenue based solely on the purchase of inventory by consultants (rather than their sales) and by conditioning the bonuses paid to consultants on minimum inventory purchases (for both the consultant and their downline), the vast majority of consultants sitting at the bottom of Defendants' pyramid were and remain destined for failure and unable to turn any profit.  Some resulted in financial ruin due to the pressure to max out credit cards and to take loans to purchase inventory.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

**A.     Plaintiff Aki Berry**

44.    Plaintiff Aki Berry signed up to purchase LuLaRoe products in October 2015 and invested approximately $5,500.  She then spent additional monies on supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, etc.

45.    Plaintiff Berry pulled money from her savings and investments to become a consultant.  Plaintiff Berry was told by Defendants and its representatives that the company was not a pyramid scheme.

46.    Plaintiff Berry was not able to choose the patterns that would appear on the clothing products / inventory she purchased from Defendants.  She received whatever patterns Defendants chose to send her.  This practice left her with a significant amount of inventory that she was unable to sell to consumers.

47.    Plaintiff Berry was told by Defendants that she would make her investment back within a few weeks to a month.   She was also instructed to consistently purchase new inventory because "the more  you buy, the more you sell."  She was pressured by Defendants and its representatives to purchase inventory weekly and to use any money she obtained from selling the products to purchase more inventory.

48.    Oftentimes, Plaintiff Berry would be presented with challenges or incentives that would provide prizes to consultants, for example, who purchased the most inventory in a particular period or, as another example, who purchased more inventory than they had purchased the previous week.  Plaintiff Berry was also aware that cruises were being offered to consultants who purchased the most inventory.

49.    Plaintiff Berry is not aware of any challenges, prizes, or incentives presented to consultants for actually selling any inventory to consumers.

50.    Plaintiff Berry saw a plethora of recruitment videos and postings by Defendants and their representatives online.  Those videos represented that consultants could make significant income by recruiting consultants and continuing to purchase large amounts of inventory.  The consistent theme presented was to buy inventory.  Consultants were told that they should have at least 10 items in every size in all styles.  This was purportedly the "magic number" of inventory.

51.     Plaintiff Berry was aware of approximately six individuals in her up-line (but there were likely more), and she recruited approximately 12 other individuals during her time as a consultant.  (Only one of which she believes is still a consultant for Defendants.)  However, Plaintiff Berry could not make any money off of her recruit's inventory purchases, unless she "qualified" by continuing to purchase more inventory herself.  Defendants' pyramid structure encouraged Plaintiff Berry to pressure her recruit to purchase inventory, because the more inventory her recruit purchased, it would decrease the amount of inventory that she (and her upline) would have to purchase to "qualify" for bonuses based on the inventory purchases of the down line.

52.     Plaintiff Berry faced great challenges selling Defendants' products.  The market had simply become too saturated with consultants who were trying to move the inventory they were perpetually purchasing.  She resigned in or about June of 2017.

53.      Plaintiff Berry had no choice but to quit the company or she would continue to lose money purchasing inventory over which she had no control and could not sell.  She was unable to attain a net recovery of her investments in Defendants' products, despite her efforts.

**B.     Plaintiff Tiffany Scheffer**

54.     Plaintiff Tiffany Scheffer signed up to purchase LuLaRoe products in or about April of 2016 and invested approximately $5,900 to purchase her initial inventory.  She then spent thousands more on supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, etc.

55.     Plaintiff Scheffer pulled money from her savings and investments to become a consultant.  Plaintiff Scheffer was told by Defendants and its representatives that the company was not a pyramid scheme.

56.     Plaintiff Scheffer was not able to choose the patterns that would appear on the clothing products / inventory she purchased from Defendants.  She received whatever patterns Defendants chose to send her.  This practice left her with a significant amount of inventory that she was unable to sell to consumers.

57.     Plaintiff Scheffer was told by Defendants that she would make her investment back within the first one to three months, but was instructed to invest any money she made back into purchasing inventory.  She was also instructed to consistently purchase new inventory because "the more  you buy, the more you sell."  She was pressured by Defendants and its representatives to purchase inventory weekly and to use any money she obtained from selling the products to purchase more inventory.

58.     Oftentimes, Plaintiff Scheffer would be presented with challenges or incentives that would provide prizes to consultants, for example, who purchased the most inventory in a particular period or, as another example, who purchased more inventory than they had purchased the previous week.  Plaintiff Scheffer was also aware that cruises were being offered to consultants who purchased the most inventory.

59.     Plaintiff Scheffer is not aware of any challenges, prizes, or incentives presented to consultants for actually selling any inventory to consumers.

60.     Plaintiff Scheffer saw a plethora of recruitment videos and postings by Defendants and their representatives online.  Those videos represented that consultants could make significant income by recruiting consultants and continuing to purchase large amounts of inventory.  The consistent theme presented was to buy inventory.  Consultants were told that they should have at least 10 items in every size in all styles.  This was purportedly the "magic number" of inventory.

61.     Plaintiff Scheffer was aware of approximately six individuals in her up-line (but there were likely more), and she recruited one other consultant, Cheryl Hayton.  However, Plaintiff Scheffer could not make any money off of her recruit's inventory purchases, unless she "qualified" by continuing to purchase more inventory herself.  Defendants' pyramid structure encouraged Plaintiff Scheffer to pressure her recruit to purchase inventory, because the more inventory her recruit purchased, it would decrease the amount of inventory that she (and her upline) would have to purchase to "qualify" for bonuses based on the inventory purchases of the down line.

62.     Plaintiff Scheffer faced great challenges selling Defendants' products.  The market had simply become too saturated with consultants who were trying to move the inventory they were perpetually purchasing.  She resigned in or about May 2017.

63.      Plaintiff Scheffer had no choice but to quit the company or she would continue to lose money purchasing inventory over which she had no control and could not sell.  She was unable to attain a net recovery of her investments in Defendants' products, despite her efforts.

**C.     Plaintiff Cheryl Hayton**

64.     Plaintiff Cheryl Hayton signed up to purchase LuLaRoe products in or about April of 2016 and invested approximately $6,000 to purchase her initial inventory.  She then spent thousands more on supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, etc.

65.     Plaintiff Hayton pulled money from her savings to become a consultant.  Plaintiff Hayton was told by Defendants and its representatives that the company was not a pyramid scheme.

66.     Plaintiff Hayton was not able to choose the patterns that would appear on the clothing products / inventory she purchased from Defendants.  She received whatever patterns Defendants chose to send her.  This practice left her with a significant amount of inventory that she was unable to sell to consumers.

67.     Plaintiff Hayton was told by Defendants that she would make her investment back within a few months working part time.  She was also instructed to consistently purchase new inventory because "the more you buy, the more you sell."  She was pressured by Defendants and its representatives to purchase inventory weekly and to use any money she obtained from selling the products to purchase more inventory.

68.     Oftentimes, Plaintiff Hayton would be presented with challenges or incentives that would provide prizes to consultants, for example, who purchased the most inventory in a particular period or, as another example, who purchased more inventory than they had purchased the previous week.  Plaintiff Hayton was also aware that cruises were being offered to consultants who purchased the most inventory.

69.     Plaintiff Hayton is not aware of any challenges, prizes, or incentives presented to consultants for actually selling any inventory to consumers.

70.     Plaintiff Hayton saw a plethora of recruitment videos and postings by Defendants and their representatives online.  Those videos represented that consultants could make significant income by recruiting consultants and continuing to purchase large amounts of inventory.  The consistent theme presented was to buy inventory.  Consultants were told that they should have at least 10 items in every size in all styles.  This was purportedly the "magic number" of inventory.

71.     Plaintiff Hayton was aware of approximately six to eight individuals in her up-line (but there were likely more), and she was unable to recruit any other consultants.

72.     Plaintiff Hayton faced great challenges selling Defendants' products.  The market had simply become too saturated with consultants who were trying to move the inventory they were perpetually purchasing.  She resigned in or about June 2017.

73.      Plaintiff Hayton had no choice but to quit the company or she would continue to lose money purchasing inventory over which she had no control and could not sell.  She was unable to attain a net recovery of her investments in Defendants' products, despite her efforts.

## CLASS ALLEGATIONS

74.     Plaintiffs bring this suit as a class action pursuant to Federal Rule of Civil Procedure 23.

75.     <u>Class Definition</u>: All persons who were and are LuLaRoe Consultants from 2013 until present.  Excluded from the class are the Defendants, their employees, family members, and any consultant who participated in and profited as the result of their participation in and facilitation of the LuLaRoe pyramid scheme.  Also excluded from this matter are any judicial officers presiding over this matter and their immediate family members.

76.     Plaintiffs also seek relief for themselves and all members of the class who agreed to a choice of law of California under California's Unfair and Deceptive Practices Acts, and California's Unfair Competition Act.

Class Action Complaint                    16

77.     Plaintiffs seek to pursue a private attorney general action for injunctive relief for themselves and all members of the class who agreed to a choice of law of California, and Plaintiffs satisfy the standing and class action requirements.

78.     The members of the class number are well into the tens of thousands and joinder of all Class Members in a single action is impracticable.

79.     The members of the class will be easily ascertained because all class members have written contracts with Defendants, which Defendants have preserved.

80.     There are questions of law and/or fact common to the class and subclass, including but not limited to:

a.      Whether Defendants were (and for how long) or are currently operating an unlawful scheme;

b.      Whether consultants paid money to Defendants for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers;

c.      Whether consultants were required to make an initial investment;

d.      Whether Defendants had a buy-back rule and enforced it;

e.      Whether Defendants' Sales and Marketing Plan was or is an endless chain under California state law;

f.      Whether Defendants omitted to inform Plaintiffs and the Class Members that they were entering into an illegal scheme where an overwhelming number of participants lose money;

g.      Whether the Statements of Average Gross Compensation distributed by Defendants were deceptive and/or misleading;

h.      Whether Defendants' business model primarily incentivizes the payment of compensation facially unrelated to the sale of the product to ultimate users, because it is paid on the amount of inventory/product purchased by downline consultants rather than on actual sales to consumers;

i.      Whether Defendants engaged in acts of mail and/or wire fraud in direct violation of RICO;

j.      To what extent the conduct injured Plaintiffs and the Class Members;

k.      Whether Defendants' conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law;

l.      Whether Defendants' conduct constitutes unfair competition under California state law; and

m.      Whether Defendants' conduct constitutes false advertising under California state law.

81.    These and other questions of law and/or fact are common to the class and predominate over any question affecting only individual class members.

82.    Plaintiffs' claims are typical of the claims of the class in that Plaintiffs' were consultants for Defendants and were unable to earn any profit because of the illegal scheme set forth herein.

83.    Plaintiffs will fairly and adequately represent the interests of the class.

84.    Plaintiffs' claims are typical of those of the class.  Plaintiffs' interests are fully aligned with those of the class, and Plaintiffs have retained counsel experienced and skilled in complex class action litigation.

85.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

86.    Plaintiffs know of no difficulty likely to be encountered in the management of this case that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**(Endless Chain Scheme; California Penal Code §327and California Civil Code § 1689.2)**
**[Against All Defendants]**

87.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

88.    California Penal Code § 327 renders endless chain schemes illegal.

89.    Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

90.    Defendants are operating an endless chain scheme.

91.    Plaintiffs and the Class Members have suffered an injury in fact and have lost money or property as the result of Defendants' business acts, omissions, and practices.

92.    Plaintiffs and the class are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme.

**SECOND CLAIM FOR RELIEF**
**(RICO 18 U.S.C. § 1962(a))**
**[Against All Defendants]**

93.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

94.    Violation of California Penal Code §327 is punishable by imprisonment for over one year, violation of California Penal Code §327 can provide the basis for a RICO predicate act of racketeering.

95.    Defendants and others willfully and intentionally violated and continue to violate RICO and California law with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities in violation of the mail and wire fraud statutes,18 U.S.C. §§ 1341 and 1343, 18 U.S.C. 1962(a), and California Penal Code §327.

96.    Defendants and are engaged in activities affecting federal interstate and foreign commerce and are entities capable of holding a legal or beneficial interest in property. Defendants are "persons," as that term is defined by 18 U.S.C. §1961(3).

97.    Defendants make up the "LuLaRoe Enterprise" as an association of entities and individuals associated in fact to operate an illegal pyramid scheme. The LuLaRoe Enterprise is not a legal entity within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). Defendants have been members of the LuLaRoe Enterprise from at least May 2013 and

continuing until the present.  Defendants are separate entities from the LuLaRoe Enterprise and play separate and distinct roles in the operation of the LuLaRoe Enterprise.

98.    From at least 2013 and continuing until the present, within the Central District of California and elsewhere, Defendants, in association with each other did knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the LuLaRoe Enterprise through a pattern of racketeering activity.

99.    From at least 2013 and continuing until the present, Defendants, with each other, executed a *per se* scheme to defraud through a pattern of racketeering made up of distinct acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.  Defendants engaged in and affected interstate and foreign trade.  Defendants transacted business through the instrumentalities of interstate commerce such as telephones, facsimile machines, the internet, email, and the United States mail and interstate commercial carrier to communicate in furtherance of the activities of the LuLaRoe Enterprise.  Defendants advertise, market, and sell products and services throughout the United States.  The operation of the enterprise has continued over several years, including activities in every state, and has affected and damaged, and continues to affect and damage, commercial activity.

100.    To further the goals of the LuLaRoe Enterprise, which were to (1) earn money through fraudulent means, (2) entice individuals to become LuLaRoe consultants, (3) entice consultants to purchase "inventory" from LuLaRoe; (4) entice existing consultants to recruit others to become LuLaRoe consultants and profit off those recruits' inventory purchases of LuLaRoe products, and (5) reap large profits for themselves based on false representations, Defendants engaged in various forms of illegal activity, including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

101.    The pattern of racketeering activity alleged is distinct from the LuLaRoe Enterprise.  Each act of racketeering activity is distinct from the LuLaRoe Enterprise in that each is a separate offense committed by an entity or individual while the LuLaRoe Enterprise is an association of entities and individuals. The LuLaRoe Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or duties.

102.    The racketeering acts set out herein, and others, all had the same pattern and similar purpose of defrauding Plaintiffs and the class members for the benefit of the LuLaRoe Enterprise and its members.  Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission and had similar results affecting Plaintiffs and the Class Members.  The racketeering acts of mail and wire fraud were also related to each other in that they were part of the LuLaRoe Enterprise's goal to fraudulently induce Plaintiffs and the Class Members to join the illegal scheme, purchase products, and recruit others to join the pyramid scheme.

103.    Defendants' wrongful conduct has been and remains part of LuLaRoe Enterprise's ongoing way of doing business and constitutes a continuing threat. Without the repeated acts of mail and wire fraud, the LuLaRoe Enterprise's fraudulent scheme would not have succeeded.

104.    Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of Defendants, was reinvested in the operations of the LuLaRoe Enterprise for the following purposes: (a) to expand the operations of the LuLaRoe Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new consultants; (b) to facilitate the execution of the illegal scheme; and (c) to convince current consultants to recruit new consultants and purchase LuLaRoe products.

105.    Plaintiffs and the Class Members were injured by the reinvestment of the racketeering income into the LuLaRoe Enterprise because they invested millions of dollars of their own money through their purchasing of LuLaRoe products, all of which were packaged and shipped throughout the United States.

106.    In connection with promoting and executing their illegal scheme, members of the LuLaRoe Enterprise knowingly and recklessly placed and caused to be placed in the United States mail or by interstate commercial carrier, or took or received therefrom, matters or things to be sent to or delivered by the United States mail or by interstate commercial carrier comprising, among other things product, invoices, letters, promotional materials, brochures, products and checks to Plaintiffs and Class Members and received communications between and

among themselves through the United States mail, in all fifty states and the District of Columbia. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme.

107.    In connection with promoting and executing their illegal scheme, members of the LuLaRoe Enterprise engaged in wire fraud, in violation of 18 U.S.C. § 1343, by, among other things, knowingly and recklessly transmitting or causing to be transmitted with wire communications, in interstate and foreign trade, materials promoting the illegal LuLaRoe Pyramid on internet web sites, email, facsimile, telephone, and text messages, including promotional materials, registration information, product information, and invoices. Defendants maintain websites and social media profiles on the internet where LuLaRoe consultants can and do buy products and are given inducements to continue working as consultants within the LuLaRoe Pyramid.  LuLaRoe maintains various websites hosting promotional videos featuring the promotion of the unlawful scheme and other materials promoting the illegal scheme. LuLaRoe sent and received these interstate wire communications to and from all fifty states and the District of Columbia.

108.    Each Defendant has promoted the LuLaRoe Pyramid and LuLaRoe Enterprise. Each use of the mail or wire by Defendants was and is done in furtherance of the LuLaRoe Pyramid is an act of racketeering.

**THIRD CLAIM FOR RELIEF**
**(RICO 18 U.S.C. § 1962(c))**
**[Against All Defendants]**

109.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

110.    Defendants are associated with the LuLaRoe Enterprise. In violation of 18 U.S.C. § 1962(c), Defendants conducted and/or participated in the conduct of the affairs of the LuLaRoe Enterprise, including participation in activities in furtherance of Defendants' fraudulent scheme, through the pattern of racketeering activity earlier alleged.

111.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs and the Class Members were induced to, and did, become distributors in the LulaRoe Pyramid scheme and purchased multi-millions of dollars of the LuLaRoe products and recruited

others to do the same.  Plaintiffs and the Class Members were injured by Defendants' unlawful conduct. The funds used to buy LuLaRoe products constitute property of Plaintiffs and the Class Members within the meaning of 18 U.S.C. § 1964(c).

112.    Under 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble their damages, plus interest, costs and attorney's fees.

**FOURTH  CLAIM  FOR  RELIEF**
**(RICO 18 U.S.C. § 1962(d))**
**[Against All Defendants]**

113.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

114.    Defendants agreed to work together in a symbiotic relationship  to carry on the illegal scheme.  Under that agreement, Defendants and others conspired  to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

115.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and the Class Members were injured by Defendants' unlawful conduct. The funds used to buy LuLaRoe products constitute property of Plaintiffs and the Class Members under 18 U.S.C. § 1964(c).

116.    Under 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble their damages, plus interest, costs and attorney's fees.

**FIFTH CLAIM FOR RELIEF**
**(Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200, et seq.)**
**[Against All Defendants]**

117.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

118.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all other LuLaRoe consultants in the class who signed an agreement with Defendants governed by California law.

119.    Defendants have engaged in constant and continuous illegal, unfair, and fraudulent business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code§ 17200, et seq. The acts or practices alleged constitute a pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of consumers.

120.     Under California Business and Professions Code§ 17200, an "unlawful" business practice violates California law.  Defendants' business practices are illegal because they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under California law. Defendants are engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code§ 327.  Defendants utilize this illegal pyramid scheme with the intent, directly or indirectly to dispose of property, in LuLaRoe products, and to convince distributors to recruit others to do the same.

121.     Under California Business and Professions Code§ 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  Defendants' promotion and operation of an illegal pyramid scheme is unethical, oppressive, and unscrupulous in that Defendants are duping consumers out of millions of dollars through the illegal pyramid scheme.

122.     Under California Business and Professions Code § 17200, a "fraudulent" business practice is likely to deceive the public.  Defendants' business practice is fraudulent in that they have deceived and continue to deceive the public by misrepresenting their business.  Defendants have made numerous misrepresentations about the income that a consultant can realize by becoming a consultant and participating in the scheme and have failed to inform the public they are operating an illegal pyramid scheme.  Plaintiffs and the Class Members have relied, and continue to rely on Defendants' misrepresentations and omissions to their detriment.

123.     Because of these unlawful acts, Defendants have reaped and continues to reap unfair benefits and illegal profits at the expenses of Plaintiffs and the Class Members.  Defendants should be made to disgorge these ill-gotten gains and return to Plaintiffs and the Class Members the wrongfully taken revenue.

124.     Defendants' unlawful, unfair and fraudulent acts and/or omissions will not be completely and finally stopped without orders of an injunctive nature.  Under California Business and Professions Code section 17203, Plaintiffs seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as

complained of to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal pyramid scheme.  Plaintiffs also seek restitution, disgorgement, and any other appropriate equitable relief.

**SIXTH CLAIM FOR RELIEF**
**False Advertising (California Business and Professions Code § 17500, et seq.)**
**[Against All Defendants]**

125.    Plaintiffs incorporate all previous allegations as if fully set forth herein.

126.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all other LuLaRoe consultants in the class who signed an agreement with LuLaRoe governed by California law.

127.    Defendants' business acts, false advertisements and materially misleading omissions constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code§ 17500, et seq.

128.    Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to:

a.    Defendants failing to disclose to consumers that they were entering into an illegal pyramid scheme;

b.    Defendants misrepresenting the money that a consultant would earn;

c.    Defendants' marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair, and fraudulent advertising in connection with their false advertising to induce consumers to purchase products and join the illegal pyramid scheme. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

129.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the Class Members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and the Class

Members their profits and compensation and/or make restitution to Plaintiffs and the Class

Members.

130.    Under California Business and Professions Code section 17535, Plaintiffs and the

Class Members seek a judicial order directing Defendants to cease and desist with all false

advertising related to the Defendants' illegal pyramid scheme and any such other injunctive

relief as the Court finds just and appropriate.  Plaintiffs also seek restitution, disgorgement, and

any other appropriate equitable relief.

## PRAYER FOR RELIEF

The named Plaintiffs and the Class Members request the following relief:

    a.    Certification of the class;

    b.    A jury trial and judgment against Defendants;

    c.    Damages for the financial losses incurred by Plaintiffs and the Class

        Members because of Defendants' conduct and for injury to their business

        and property, all because of Defendants' violations of § 1964(a), (c) and

        (d) and that such sum be trebled under 18 U.S.C. § 1964(c);

    d.    Restitution, disgorgement of monies, and any other appropriate equitable

        relief;

    e.    Temporary and permanent injunctive relief enjoining Defendants working

        in concert from further unfair, unlawful, fraudulent and/or deceptive acts,

        including, but not limited to, false advertising;

    f.    The cost of suit, including reasonable attorneys' fees under 18 U.S.C. 25 §

        1964(c) and under California Code of Civil Procedure § 1021.5 and

        otherwise by law;

    g.    For general, compensatory and exemplary damages in an amount yet to be

        ascertained; and

//

//

//

1          h.      For such other damages, relief and pre- and post-judgment interest as the

2          Court may deem just and proper.

3      For the purposes of due process and as required by the Federal Rules of Civil Procedure,

4 Plaintiffs and the Class make a demand in this matter, which they set at $1 Billion.  This is

5 understood to be a reservation of rights for default-judgment purposes, and reflects, among other

6 things, that the applicable law allows for disgorgement and restitution.  Plaintiffs and the Class

7 highlight that Defendants enrolled at least 80,000 individuals, each of whom paid at least $5,000

8 to participate in the pyramid scheme, and many of whom thereafter paid repeatedly additional

9 funds to Defendants. This demand may be increased or decreased according to proof in

10 accordance with applicable law.

Date: October 23, 2017          CLAYEO C. ARNOLD
                                   A Professional Law Corporation

                                   By: _____/s/ Joshua H. Watson_____
                                      JOSHUA H. WATSON
                                      Attorney for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class demand trial by jury for all claims in which a jury is permitted.

Date: October 23, 2017          CLAYEO C. ARNOLD
                                   A Professional Law Corporation

                                   By: _____/s/ Joshua H. Watson_____
                                      JOSHUA H. WATSON
                                      Attorney for Plaintiffs